David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

SUSAN VANA, Individually and on Behalf of All Others Similarly Situated,

                Plaintiff,

     v.

SPARK NETWORKS, INC., BRAD GOLDBERG, MICHAEL J. MCCONNELL, MICHAEL BRODSKY, IAN V. JACOBS, JOHN H. LEWIS, DANNY ROSENTHAL, and WALTER L. TUREK,

                Defendants.

Civil Action No. 2:17-cv-7603

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

   **1. VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Susan Vana ("Plaintiff"), by and through her undersigned attorneys, brings this stockholder class action on behalf of herself and all other similarly situated public stockholders of Spark Networks, Inc. ("Spark" or the "Company") against Spark, Brad Goldberg, Michael J. McConnell, Michael Brodsky, Ian V. Jacobs, John H. Lewis, Danny Rosenthal, and Walter L. Turek, the members of the Spark's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with Spark, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between Spark and Affinitas GmbH ("Affinitas") through the transaction as alleged in detail herein (the "Proposed Transaction"). Plaintiff alleges the following based upon personal knowledge as to herself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.       On May 2, 2017, Spark and Affinitas issued a joint press release announcing that they had entered into a definitive agreement to combine in a stock-for-stock merger (the "Merger Agreement") by an among Spark, Affinitas, New Spark, and Chardonnay Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of New Spark ("Merger Sub"), pursuant to which the parties agreed to combine the businesses of Spark and Affinitas under a holding company, New Spark, organized under the laws of Germany.

2.       Under the terms of the Merger Agreement, Spark stockholders will be entitled to receive, for each share of Spark common stock, a number of depositary shares ("New Spark ADSs") equal to the Adjustment Ratio[1], with each New Spark

---

[1] The "Adjustment Ratio" means 0.1, unless prior to the time at which the Merger becomes effective, the warrant to purchase Spark Shares held by PEAK6 Investments, L.P. ("PEAK6") is exercised in whole or in part, in which case the "Adjustment Ratio" means 0.1 multiplied by a fraction, (a) the numerator of which is (x) the number of Spark Shares plus the number of Spark

ADS representing 0.1 ordinary shares of new Spark. Consequently, current Spark stockholders will collectively own approximately 25% of New Spark, while Affinitas stockholders will collectively own approximately 75% of New Spark.

3.      The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Spark's public stockholders.

4.      On October 10, 2017, in order to convince Spark's shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy Statement contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, B. Riley & Co., LLC ("B. Riley"); and (iii) the background process leading up to the Proposed Transaction.

6.      The special meeting of Spark shareholders to vote on the Proposed Transaction will be held on November 2, 2017. It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin

---

restricted stock units ("Spark RSUs") outstanding as of the effective time of the Merger (the "Post-Warrant Exercise Share Number") minus the (y) aggregate number of Spark Shares issued in connection with the exercise of the warrant, and (b) the denominator of which is the Post-Warrant Exercise Share Number. The warrant gives PEAK6 the ability to acquire up to 7,500,000 Spark Shares at an exercise price of $1.74 per share.

1   Defendants from holding the shareholder vote on the Proposed Transaction and
2   taking any steps to consummate the Proposed Transaction unless and until the
3   material information discussed below is disclosed to Scripps's shareholders
4   sufficiently in advance of the vote on the Proposed Transaction or, in the event the
5   Proposed Transaction is consummated, to recover damages resulting from the
6   Defendants' violations of the Exchange Act.

7   **PARTIES**

8       8.      Plaintiff is, and at all relevant times has been, a shareholder of Spark.

9       9.      Defendant Spark is a Delaware corporation and maintains its principal
10  executive offices at 8383 Wilshire Blvd., Suite 800, Beverly Hills, California 90211.
11  Spark's common stock is listed and traded on the NYSE under the ticker symbol
12  "LOV."

13      10.     Individual Defendant Brad Goldberg is the Chairman of the Board, and
14  has been since 2016, a Sparks director.

15      11.     Individual Defendant Michael J. McConnell is, and has been since
16  2015, a Sparks director.

17      12.     Individual Defendant Michael Brodsky is, and has been since 2015, a
18  Sparks director.

19      13.     Individual Defendant Ian V. Jacobs is, and has been since 2014, a
20  Sparks director.

21      14.     Individual Defendant John H. Lewis is, and has been since 2014, a
22  Sparks director.

23      15.     Individual Defendant Danny Rosenthal is, and has been since 2016, a
24  Sparks director.

25      16.     Individual Defendant Walter L. Turek is, and has been since 2014, a
26  Sparks director.

27      17.     The parties in paragraphs 10-16 are referred to herein as the "Individual
28  Defendants" and/or the "Board," collectively with Spark the "Defendants."

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiffs allege violations of Section 14(a) and 20(a) of the Exchange Act.

19.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Spark is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Spark (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a)  The Class is so numerous that joinder of all members is impracticable.  As of October 2, 2017, there were approximately 32.25 million shares of Spark common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders

of Spark will be ascertained through discovery;

b) There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.   whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a) of the Exchange Act;

    ii.   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.   whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy Statement.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a

CLASS ACTION COMPLAINT

1     whole; and

2          g)    A class action is superior to other available methods for fairly and

3                efficiently adjudicating the controversy.

4                          <u>**SUBSTANTIVE ALLEGATIONS**</u>

5     **I.      The Merger Consideration is Inadequate**

6          23.    Spark is a leader in creating communities that help individuals form

7     life-long relationships with others that share their interests and values.  Spark's core

8     properties, JDate and ChristianMingle, are communities geared towards singles of

9     the Jewish and Christian faiths.  Through Spark's websites and mobile applications,

10    Spark helps members search for and communicate with other like-minded

11    individuals.  Along with these two core brands, Spark also operates a number of

12    other niche-focused and international websites and mobile applications and

13    maintains a physical presence in the United States.

14         24.    On May 2, 2017, Spark and Affinitas issued a joint press release

15    announcing the Proposed Transaction.  The press release stated, in relevant part:

16

17    **SPARK NETWORKS AND ELITESINGLES TO MERGE,**
      **CREATING A GLOBAL LEADER IN ONLINE DATING**

18

19    ***Brings Together Leading Brands Including JDate,***
      ***ChristianMingle, EliteSingles and eDarling***

20

21    ***Combined Company Will Be Named Spark Networks SE and***
      ***Be Listed on the NYSE MKT***

22

23    LOS ANGELES, CA and BERLIN, GERMANY, May 2, 2017
      – Spark Networks, Inc. ("Spark") (NYSE MKT: LOV) and

24    Affinitas GmbH ("EliteSingles"), which operates premium

25    online dating platforms EliteSingles, eDarling and Attractive
      World, today announced that they have entered into a definitive

26    agreement to combine in a stock-for-stock merger, creating one

27    of the world's largest online dating providers with a portfolio of
      premier global brands.  The combination will create a company

28    with more than $115 million of pro forma combined revenue

                                        7

over the twelve months ended March 31, 2017 and nearly 500,000 period-ending global subscribers as of March 31, 2017.(1)

Danny Rosenthal, Spark's Chief Executive Officer, commented, "We are thrilled to be combining with such a natural partner. The scale, data analytics, and significant operating expertise that EliteSingles brings will enhance our existing brand portfolio. Together, we will be a global leader in online dating, with the opportunity to drive growth across our entire platform."

"We have a clear vision of becoming the global leader in premium dating and this transaction is an important step towards that goal," said Jeronimo Folgueira, Chief Executive Officer of EliteSingles. "By combining the market leader in religious dating with EliteSingles' portfolio of strong brands, we will create a singular entity, well-positioned to benefit from increased scale and improved financial strength. Together, we will leverage the strengths of each company to provide an exceptional user experience and drive shareholder value."

**Strategic Rationale**

- Increased Scale: With nearly 500,000 period-ending subscribers and over $115 million in revenue for the twelve months ended March 31, 2017, the combined company would be one of the world's largest online dating providers on a pro forma basis. Spark Networks SE will be well-positioned to invest in new technologies and leverage both the EliteSingles and Spark technology platforms to deliver an enhanced customer experience, increase brand awareness through expanded marketing, and pursue growth opportunities.

- Diversified Global Platform: The transaction brings together Spark's portfolio of premium brands–including JDate, JSwipe, and ChristianMingle–with fast-growing brands EliteSingles, eDarling, and Attractive World, which collectively grew revenue by more than 20% in 2016. Together, these brands will cater to a broad spectrum of users with a presence in 26 countries, creating a more diverse and balanced footprint. On a combined basis, North America represented 40% of the pro forma 2016 revenue, with the

CLASS ACTION COMPLAINT

remaining 60% generated from international markets, including France, U.K., Australia and Israel.

- <u>Attractive Financial Position:</u> (1) On a projected 2018 basis, the combined company is expected to generate between $118 – $122 million in revenue and between $18 – $22 million in Adjusted EBITDA, driven by incremental revenue growth and identified cost savings.

(1) Financials are pro forma and unaudited

**Transaction Details**

EliteSingles shareholders will own approximately 75% of the combined company and Spark shareholders will own approximately 25%. The new public entity is expected to be listed on the NYSE MKT exchange through an American Depositary Receipt ("ADR").

The transaction has been approved by Spark's Board of Directors and is expected to close in the fourth quarter of 2017, subject to Spark shareholder approval, and the satisfaction of certain other customary closing conditions. Shareholders representing approximately 35% of the outstanding Spark shares have agreed to vote their shares in favor of the transaction.

**Governance and Structure**

The combined company will be organized as a European company. The combined company will be named Spark Networks SE and will be headquartered in Berlin, Germany and maintain a significant U.S. presence with offices in New York City and Lehi, Utah. Jeronimo Folgueira, CEO of EliteSingles, will serve as Chief Executive Officer and Robert O'Hare, Spark's Chief Financial Officer, will continue in that role with the combined company. Michael Schrezenmaier, Managing Director of EliteSingles, will become Chief Operating Officer.

The Board of Directors will be comprised of seven directors, including three to be selected by EliteSingles, one to be selected

by Spark, and three to be mutually agreed upon by EliteSingles and Spark.[2]

25.    The Merger Consideration offered to Spark shareholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.  The Proposed Transaction will deny Class Members their right to fully share equitably in the true value of the Company.

26.    For example, the Company's Fourth Quarter 2016 results, released on March 21, 2017, were positive.  Robert O'Hare, the Company's Chief Financial Officer, commented on these results:

> Spark ended the fourth quarter with $11.4 million of cash and cash equivalent, an increase from $11.3 million at the end of the prior quarter and $6.6 million at the end of 2015. At year end the Company had no outstanding debt.[3]

27.    InvestorPlace—a leading investing and financial news site—stated that Spark is a "hot dating stock" with potential to grow, and noted that Spark has zero debt on its books, operates in several nice markets, and the Company's shares are up 10% year-to-date.[4]

28.    In sum, the Offer Price appears to inadequately compensate Spark shareholders.

29.    It is therefore imperative that Spark shareholders receive the material information (discussed in detail below) that has been omitted from the Proxy Statement, which is necessary for the Company's public stockholders to properly exercise their corporate suffrage rights and make a fully informed decision

---

[2] Spark Networks Inc., Current Report (Form 8-K), at Exhibit 99.1 (Joint Press Release of Spark Networks, Inc. and Affinitas GmbH (May 2, 2017).

[3] Spark Networks' (LOV) CEO Danny Rosenthal on Q4 2016 Results – Earnings Call Transcript, March 21, 2017, available at: https://seekingalpha.com/article/4056962-spark-networks-lov-ceo-danny-rosenthal-q4-2016-results-earnings-call-transcript?part=single.

[4] *3 Dating Stocks That Will Get More Love Than You Think*, INVESTORPLACE (July 28, 2017), https://investorplace.com/2017/07/dating-stocks-love-lov-mtch-meet/#.WeZWNGhSxaQ.

concerning whether to vote in favor of the Proposed Transaction.

## II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers

30.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Spark.

31.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Spark shareholders.  Specifically, the Merger Agreement generally states that the Company and the Individual Defendants shall not, directly or indirectly: (A) initiate, solicit, seek, or knowingly facilitate or encourage (including by way of furnishing non-public information) any inquiries, proposals, or offers that constitute, or would reasonably be expected to lead to, an acquisition proposal; (B) engage or participate in any discussions or negotiations regarding, or furnish any nonpublic information to any person in connection with or for the purpose of encouraging or facilitating, any inquiries, proposals, or offers that constitute, or would reasonably be expected to lead to, an acquisition proposal; or (C) enter into any letter of intent, commitment, agreement in principle, or other similar type of agreement providing for an acquisition proposal (whether written or oral, binding, or nonbinding), or resolve, propose, recommend, or agree to do any of the foregoing.  *See* Proxy Statement 121-22.

32.    Furthermore, the Company and the Individual Defendants must promptly notify, orally or in writing, Discovery of any proposals, indications of interest, and/or draft agreements received from other persons making an acquisition proposal.  *See* Proxy Statement 122.

33.    Additionally, the Merger Agreement grants Affinitas recurring and unlimited matching rights, which provides it with several days to negotiate with

11

1  Spark, amend the terms of the Merger Agreement, and make a counter-offer in the
2  event a superior offer is received.  *See* Proxy Statement 122-24.

3      34.    The non-solicitation and matching rights provisions essentially ensure
4  that a superior bidder will not emerge, as any potential suitor will undoubtedly be
5  deterred from expending the time, cost, and effort of making a superior proposal
6  while knowing that Affinitas can easily foreclose a competing bid.  As a result, these
7  provisions unreasonably favor Affinitas, to the detriment of Spark's shareholders.

8      35.    The Merger Agreement also provides that Spark must pay Affinitas a
9  termination fee of $1,500,000 under certain conditions, including in the event Spark
10  elects to terminate the Merger Agreement to pursue a superior proposal.  *See* Proxy
11  Statement 128-29.  The termination fee provision further ensures that no competing
12  offer will emerge, as any competing bidder would have to pay a naked premium for
13  the right to provide Spark shareholders with a superior offer.

14      36.    Ultimately, these preclusive deal protection provisions restrain Spark's
15  ability to solicit or engage in negotiations with any third party regarding a proposal
16  to acquire all or a significant interest in the Company.

17      37.    Given that the preclusive deal protection provisions in the Merger
18  Agreement impede a superior bidder from emerging, it is imperative that Spark's
19  shareholders receive all material information necessary for them to cast a fully
20  informed vote at the shareholder meeting concerning the Proposed Transaction.

21  **III.    The Materially Incomplete and Misleading Proxy Statement**

22      38.    On October 4, 2017, Spark filed the Proxy Statement with the SEC in
23  connection with the Proposed Transaction.  The information contained in the Proxy
24  Statement has thus been disseminated to Spark common stockholders to solicit their
25  vote in favor of the Proposed Transaction.  The Proxy Statement omits certain
26  material information concerning the fairness of the Proposed Transaction and
27  Merger Consideration.  Without such information, Spark common stockholders
28  cannot make a fully informed decision concerning whether or not to vote in favor of

the Proposed Transaction.

39.    First, with respect to the *Projected Unaudited Financial Information*, the Proxy Statement fails to provide material information concerning the Company's financial projections. *See* Proxy Statement 94-95.  Specifically, the Proxy Statement provides projections for non-GAAP financial metrics, including Adjusted EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to their most comparable GAAP measures.

40.    The omissions from the above-referenced projections renders the financial projections included on pages 94 through 95 of the Proxy Statement materially incomplete and misleading.  If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

41.    Moreover, on page 95 of the Proxy Statement, the Company claims that GAAP reconciliation cannot be made available without unreasonable efforts.  This is a misstatement.  Spark regularly reconciles non-GAAP financial measures, including EBITDA, to GAAP Net Income in their earnings press releases prepared for investors.  In fact, the Company has performed line item GAAP reconciliations in all of the earnings releases available on its website.  Below is an excerpt from their most recent press release on May 2, 2017:

CLASS ACTION COMPLAINT

**SPARK NETWORKS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(unaudited, in thousands, except per share data)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Revenue | $ 7,264 | $ 9,859 |
| Cost and expenses: | | |
| Cost of revenue (exclusive of depreciation shown separately below) | 2,354 | 6,229 |
| Sales and marketing | 650 | 1,452 |
| Customer service | 635 | 993 |
| Technical operations | 219 | 297 |
| Development | 715 | 1,030 |
| General and administrative | 3,234 | 2,511 |
| Depreciation | 1,708 | 712 |
| Amortization of intangible assets | 49 | 78 |
| Impairment of intangible and long-lived assets | 9 | 39 |
| Total cost and expenses | 9,573 | 13,341 |
| Operating loss | (2,309) | (3,482) |
| Interest (income) expense and other, net | (231) | (141) |
| Loss before provision for income taxes | (2,078) | (3,341) |
| Income tax provision | 47 | 67 |
| Net loss | (2,125) | (3,408) |
| Net loss per share - basic and diluted | $ (0.07) | $ (0.13) |
| Weighted average shares outstanding - basic and diluted | 32,003 | 25,846 |
| **Stock-based compensation:** | | |
| Sales and marketing | 1 | 28 |
| Customer service | 3 | 1 |
| Technical operations | 2 | 21 |
| Development | (4) | 5 |
| General and administrative | 158 | 267 |
| Total stock-based compensation | $ 160 | $ 322 |
| **Reconciliation of Net Loss to Adjusted EBITDA:** | | |
| Net loss | $ (2,125) | $ (3,408) |
| Interest expense | 22 | 13 |
| Income tax provision | 47 | 67 |
| Depreciation | 1,708 | 712 |
| Impairment of intangible and long-lived assets | 9 | 39 |
| Amortization of intangible assets | 49 | 78 |
| Non-cash currency translation adjustments | (253) | (154) |
| Stock-based compensation | 160 | 322 |
| Non-recurring legal and acquisition costs | 514 | 64 |
| **Adjusted EBITDA** | $ 131 | $ (2,26) |

**SOURCE:** Spark Networks, Inc.

42.    Accordingly, in order to make the projections included on pages 94 through 95 of the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

CLASS ACTION COMPLAINT

43.     The Proxy Statement also fails to disclose the standalone unlevered, after-tax free cash flows that Spark was forecasted to generate for the calendar years of 2017 through 2021, which are material to Spark shareholders because they are being asked to vote on a transaction that will reduce their ownership interest by approximately 75%.  *See* Proxy Statement 92-93.  The Proxy Statement notes that such projections exist and were utilized by B. Riley in connection with its valuation analyses.   Under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation; accordingly, the question that Spark shareholders need to assess in determining whether to vote for the Proposed Transaction is clear: is the Merger Consideration being offered now fair in light of the free cash flows that Spark is expected to generate?  Without these unlevered free cash flow projections, Spark shareholders will be unable to answer this question and assess the fairness of the Merger Consideration.  The omission of such projections renders the *Projected Unaudited Financial Information* set forth on pages 94 through 95 of the Proxy Statement and the summary of B. Riley *Discounted Cash Flow* analyses on pages 92 through 93 of the Proxy Statement materially incomplete and misleading.

44.     With respect to B. Riley's *Discounted Cash Flow* analyses, including the *Spark Stand-Alone*, *Affinitas Stand-Alone*, and *Pro Forma Discounted Cash Flow Analysis – Combined Company*, the Proxy Statement fails to disclose: (i) the standalone, unlevered, after-tax free cash flows that Spark was forecasted to generate during the calendar years of 2017 through 2021; and (ii) the inputs and assumptions underlying the selection of the terminal exit multiple ranges used in each analysis. *See* Proxy Statement 92-93.  The omission of this material financial information renders the summary of the B. Riley's *Discounted Cash Flow* analyses and the derived values set forth therein incomplete and misleading.

45.     With respect to the *Pro Forma Discounted Cash Flow Analysis – Combined Company*, this information is particularly necessary in light of the fact

that Spark shareholders are being asked to approve a transaction that will provide them with stock in a combined entity.

46.     Indeed, as a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id*. at 1577-78.

47.     Similarly, the Proxy Statement fails to disclose the Net Operating Loss Carry-Forwards ("NOLs") for Spark.  *See* Proxy Statement 92.  Here, the existing NOLs are not being included in the *Discounted Cash Flow Analysis – Spark Stand-Alone*, but this information is material since it exists and, therefore, should be disclosed to Spark shareholders.  As Professor Davidoff discussed above, the

rationale to exclude certain inputs—Spark's NOLs—from the DCF analyses is equally as important as the decision to include the same inputs and, in its absence, omits material information. Accordingly, the omission of this material information renders the summary of B. Riley's DCF analyses on pages 92 through 93 of the Proxy Statement and implied equity value per share set forth therein materially incomplete and misleading.

48.   With respect to the *Public Company Comparable Analysis*, the Proxy Statement fails to disclose the individual multiples B. Riley utilized for each of the companies included in the analyses. A fair summary of analyses requires the disclosure of the individual multiples for each company. Merely providing the mean and median values to render the Total Enterprise Value is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate companies, or, instead, applied companies that would drive down the implied Total Enterprise Value of the Company. Accordingly, the omission of the individual multiples renders the summary of these analyses set forth on pages 90 through 91 of the Proxy Statement materially incomplete and misleading.

49.   Similarly, with respect to the *Precedent Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples B. Riley utilized for each of the transactions included in the analyses. A fair summary of analyses requires the disclosure of the individual multiples for the last twelve months for each of the transactions. Merely providing the mean and median values to render the Total Enterprise Value multiples is insufficient, as shareholders are unable to assess whether the banker utilized the appropriate transactions, or, instead, applied transactions that would drive down the implied Total Enterprise Value of the Company. Accordingly, the omission of the individual multiples renders the summary of these analyses set forth on pages 91 through 92 of the Proxy Statement materially incomplete and misleading.

50.   In addition, while B. Riley limited the transactions considered in the

*Premiums Paid Analysis* to change-in-control transactions involving U.S. public company targets, the Proxy fails to disclose how many of the 748 transactions were, if any, from the same market segment (i.e., online dating websites) or, in the absence thereof, are the most comparable to the Proposed Transaction. This is particularly important in light of the fact that Spark shareholders are not being provided any details regarding the 748 transactions that were analyzed except that they involved U.S. public company targets and occurred within the five-year period ending April 13, 2017.

51.    A fair summary of the *Premiums Paid Analyses* would disclose information concerning the individual transactions analyzed, when they occurred, and the premiums paid. Merely providing the range of the premiums paid renders the Implied Value per Spark Share insufficient, as Spark shareholders unable to assess whether B. Riley improperly utilized certain transactions while excluding others and, as a result, decreased the Implied Value per Spark Share. The omission of the individual transactions and their premiums paid renders the summary of these analysis materially incomplete and misleading. *See* Proxy Statement 93.

52.    Finally, with respect to the *Analyst Price Target*, the Proxy Statement fails to disclose the identity of the individual research analyst. *See* Proxy Statement 93. A fair summary of this analysis requires disclosure of this information. Merely providing the analyst's price target renders the price target insufficient, as Spark shareholders unable to assess whether B. Riley utilized credible research analyst or, instead, referenced an unreliable analyst in order to make the Merger Consideration appear more favorable. The omission of the identity of the individual research analyst renders the summary of this analysis materially incomplete and misleading. Proxy Statement 93.

53.    In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material

information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

54.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

55.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

56.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

57.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.    The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken

CLASS ACTION COMPLAINT

together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

58.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

59.    Defendants have issued the Proxy Statement with the intention of soliciting common unitholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; (ii) the valuation analyses performed by B. Riley; and (iii) the background process leading up to the Proposed Transaction.

60.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to common unitholders although they could have done so without extraordinary effort.

61.    The Individual Defendants knew or were negligent in not knowing that

the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that B. Riley reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by B. Riley as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review B. Riley's analyses in connection with their receipt of the fairness opinions, question B. Riley as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial

21

projections.

63.     Spark is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

64.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## <u>COUNT II</u>

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

65.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Spark within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Spark, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the

CLASS ACTION COMPLAINT

ability to prevent the issuance of the statements or cause the statements to be corrected.

68.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.   They were thus directly involved in preparing this document.

69.   In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiffs will be irreparably harmed.

72.   Plaintiffs and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

CLASS ACTION COMPLAINT

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 17, 2017

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel:  212-971-1341
Fax:  212-202-7880
Email:
jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

Respectfully submitted,
*/s/ David E. Bower*
David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
Fax: (212) 202-7880
Email:  dbower@monteverdelaw.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT